**THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:22-cv-200**

-----------------------------------------------------------x
JOHN DOE,                            |

               **Plaintiff,**     |

          -against -       |      **COMPLAINT**

                       |      **JURY TRIAL DEMANDED**
JANE DOE,                       |

             **Defendant.**    |
-----------------------------------------------------------x

Plaintiff John Doe[1], (hereinafter referred to as "Plaintiff' or "John Doe"), by his attorneys Nesenoff & Miltenberg, LLP and Ekstrand & Ekstrand, LLP, as and for his Complaint, respectfully alleges as follows:

**THE NATURE OF THIS ACTION**

1.     This case arises out of the actions taken by Defendant Jane Doe[2], a student at Tulane University ("Tulane") during the incidents described herein, to defame, humiliate, harass, and punish Plaintiff John Doe, also a student at Tulane during the incidents described herein, after Plaintiff and Jane Doe engaged in a consensual sexual encounter. Thereafter, Jane Doe and another student (hereinafter "Sue Roe") conspired to target John Doe in furtherance of their self-interests, in retaliation for John Doe's refusal to enter into a committed relationship with either Jane Doe or Sue Roe, and in an effort to destroy John Doe's academic career and future career goals.

---

[1] Plaintiff is filing a motion to proceed by pseudonym together with this pleading.

[2] "Jane Doe" is a pseudonym.  Consistent with Plaintiff's motion to proceed by pseudonym, all students shall be identified herein by pseudonym as well.

1

2.      John Doe and Jane Doe "matched" on a dating app, but did not have any direct communication at that time.  They did meet in person several weeks later at a music concert, at which point they also exchanged contact information.  They did not have any further contact with each other until running into each other several month later, at which point the two spent the night together.  No sexual activity of any sort occurred. In the following several days, John Doe and Jane Doe engaged in consensual sexual intercourse on two occasions. Upon information and belief, after seeing John Doe with another woman, Jane Doe was in touch with Sue Roe, colluding to defame, harass, and interfere with John Doe's education by filing fabricated complaints with Tulane's Title IX office.

3.      Defendant Jane Doe strategically utilized and manipulated Tulane's Title IX investigation process to further a malicious vendetta against John Doe. Despite Jane Doe's inconsistent and varying accounts of the events, witness statements disproving Jane Doe's allegations, and significant exculpatory evidence, Tulane ultimately found John Doe responsible for nonconsensual sexual activity with Jane Doe and imposed a sanction of expulsion.

4.      John Doe has been greatly damaged by Defendant's actions, including physical, psychological, emotional and reputational damages. He has also suffered, and will continue to suffer, economic injuries, the loss of educational and career opportunities, and loss of future potential earnings as a result of the expulsion, corresponding disciplinary mark on his academic record. The threat of further spread of false allegations that John Doe is a perpetrator of sexual assault is ever-present.

5.      John Doe therefore brings this action to obtain relief from Defendant Jane Doe based on various state law claims.

6.      Plaintiff is a natural person, citizen of the United States and resident of the County of Charleston, State of South Carolina. During the events described herein, Plaintiff was a student at Tulane University in Louisiana.

7.      Upon information and belief, Defendant Jane Doe is a resident of the County of Wake, State of North Carolina. During the events described herein, Jane Doe was a student at Tulane University.

## JURISDICTION AND VENUE

8.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

9.      This Court has personal jurisdiction over Defendant Jane Doe because Jane Doe is a resident of North Carolina.

10.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because per 28 U.S.C. § 1391(b)(3) this is an action that may not be brought in any other district and the Court has personal jurisdiction over the Defendant.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

*John Doe Attends Tulane University*

11.     John Doe Plaintiff was accepted to and enrolled in Tulane University ("Tulane" or the "University") in May 2018. He commenced his studies at Tulane in August 2018, focusing on Finance, Management and Psychology. John Doe intended to pursue a Masters of Business Analytics at Tulane University, upon his expected graduation in 2022.

12.     During his time at the University, John Doe became heavily involved in the Tulane community, engaging in social and philanthropic activities. He was the Co-President of Tulane's section of a national service organization for two consecutive years. He was the treasurer of the Food Recovery Network, a club that packages remaining food from the dining hall to send to local homeless shelters. He was one of 34 Tulane seniors selected by faculty and prior members to join Omicron Delta Kappa, an organization founded in 1834 for the purpose of making the Tulane community more equitable, inclusive, and academically rigorous. John Doe was also chosen by the Business School Associate Dean to be a Tulane Business Summer Minor Ambassador, promoting Tulane's summer business program. Additionally, John Doe was a member of the business fraternity Alpha Kappa Psi, a tutor in the tutoring center, a Merit Scholarship recipient, and involved in Tulane's club baseball league and social fraternity Zeta Beta Tau (ZBT). John Doe was on track to graduate *cum laude*.

13.     In applying to Tulane, John Doe reviewed a copy of the Tulane University Code of Student Conduct (the "Code"), which was accessible to all current Tulane students, prospective students, and the public. The Code included a list of prohibited actions that "violate Tulane University standards of conduct and will result in conduct action." ("Prohibited Conduct"). The list of Prohibited Conduct included "Furnishing false information to the University or to a University official," as well as "Harassment or intimidation." John Doe enrolled in Tulane with the understanding that he would be afforded a fair and equitable educational experience, free from the Code's expressly Prohibited Conduct.

**John Doe's Relationship With Sue Roe**

4

14.     John Doe and Sue Roe met in September of 2019. The two engaged in a casual sexual relationship from September 2019 to December 2019. Upon information and belief, towards the end of the Fall 2019 semester, Sue Roe wanted a more committed relationship with John Doe. John Doe heard from his friends M.G. and M.V. that Sue Roe had expressed an interest in officially dating John Doe. Sue Roe invited John Doe on a walk, during which John Doe told Sue Roe he was not interested in dating. Sue Roe told John Doe that she was similarly okay with remaining uncommitted and casual, in contrast to what Sue Roe had told John Doe's friends. John Doe and Sue Roe had a few sexual encounters following that conversation, but eventually stopped seeing each other. John Doe was seeing other women during that time and seldom reached out to Sue Roe.

15.     In January 2020, John Doe and Sue Roe returned to campus and did not interact much. John Doe felt tension between him and Sue Roe whenever he said "hello" to Sue Roe. Shortly thereafter, John Doe and Sue Roe each attended the same party, during which Sue Roe began to cry. In the following two semesters, John Doe and Sue Roe had very few interactions. However, Sue Roe made her negative feelings toward John Doe known to others. When John Doe's name was brought up in Sue Roe's presence, Sue Roe went out of her way to explicitly say she "hated" John Doe. In Spring 2021, John Doe and Sue Roe had a consensual sexual encounter. After that encounter, they did not interact further until August 2021.

16.     On August 22, 2021, John Doe and Sue Roe were downtown on Bourbon St. celebrating a mutual friend's birthday. Sue Roe came up to John Doe at the bar and asked him to buy her a drink, which she would later pay him back for through Venmo. John Doe and Sue Roe ended up spending time together at the party and leaving the bar together. On the ride back to

campus, John Doe and Sue Roe talked about their past relationship. Sue Roe apologized for being harsh towards John Doe following the conclusion of their relationship. Sue Roe further expressed the complicated emotions she was feeling. She explained that that evening, she had learned that a guy she was in a sexual relationship with, B.H., had started "dating" a different woman. When their Lyft ride approached Sue Roe's home, John Doe asked if he should have the car drop Sue Roe off, but Sue Roe told Doe he should come inside with her. The two went upstairs and engaged in consensual sex.

17.     Soon after, the two were talking in bed when John Doe made a comment to the effect of "we may regret that later" which, upon information and belief, Sue Roe interpreted to mean John Doe regretted having sex with her that evening. What John Doe meant by the comment was that they may regret complicating their friendship. However, Sue Roe sat up and began to cry. John Doe immediately apologized for his comment, explaining that what he said was not meant to be interpreted as anything against Sue Roe. John Doe felt that the complicated emotions Sue Roe mentioned earlier had resurfaced and suggested discussing the matter in the morning. John Doe went to sleep.

18.     Upon information and belief, while John Doe was asleep, Sue Roe was still upset over the comments John Doe made and wanted John Doe out of her bed. Sue Roe proceeded to wake up a housemate, D.E., who asked John Doe to leave. As John Doe was asleep, he was slow to respond to D.E.'s entrance into Sue Roe's room or comprehend why she was asking him to leave. According to D.E., John Doe "wasn't moving at first" when D.E. asked John Doe to leave. John Doe eventually got out of Sue Roe's bed and went home, texting Sue Roe that he left and to lock the door and wishing Roe a "good night."

6

*John Doe Meets Jane Doe*

19.    On or about September 2021, John Doe and Jane Doe "matched" on Tinder. They did not communicate each other or meet in person until they ran into each other at concert on November 20, 2021. At the concert, John Doe and Jane Doe spoke briefly and exchanged phone numbers. Thereafter, the parties did not see or communicate with each other for more than two months.

20.    On January 27, 2022, John Doe and Jane Doe accidentally ran into each other at a bar near Tulane's campus. After talking at the bar for some time, they left together and went to John Doe's house, where they fell asleep but did not engage in sexual intercourse. In the morning, they kissed for several minutes before Jane Doe stated "You're not going to be able to just fuck me like these other Tulane girls," to which John Doe responded "That's perfectly fine with me." Soon thereafter, John Doe and Jane Doe said goodbye, and Jane Doe left.

21.    On January 28, 2022, John Doe invited Jane Doe to his fraternity's upcoming date party and Jane Doe accepted. After asking Jane Doe to the date party, John Doe hung out with his friends M.V. and K.R. Upon learning that John Doe invited Jane Doe to be his date, K.R. warned John Doe to be careful because of information she had heard about Jane Doe.  K.R. had previously had a sexual relationship with H.W., who had recently been banned from campus for violating COVID-19 guidelines for a birthday party he threw. K.R. explained that H.W. had just ended his relationship with Jane Doe and started a relationship with K.R. right before being reported to the University for violating COVID-19 guidelines. H.W. and others involved in the situation had deduced that Jane Doe was the one who reported him, presumably out of spite for breaking up with her.

7

22.     On January 29, 2022, John Doe and Jane Doe attended John Doe's fraternity date party, held at the Fair Grounds Race Course in New Orleans. John Doe picked Jane Doe up in the late morning and brought her back to his house. After approximately an hour of hanging out with John Doe's friends, John Doe and Jane Doe went to John Doe's fraternity house, where he introduced Jane Doe as his date.  Along with others attending the party, John Doe and Jane Doe boarded busses that transported the entire group to the Race Course.

23.     While walking through the crowded field level of the Race Course, John Doe and Jane Doe passed Sue Roe. Soon after, John Doe had a brief conversation with a member of another fraternity, "K.S." who exchanged hellos with Jane Doe. When K.S. left, Jane Doe told John Doe that K.S. had previously assaulted her by trapping her in a room and refusing to let her leave unless she had sex with him. John Doe expressed sympathy for what Jane Doe had allegedly experienced.

24.     Soon after sharing her story, Jane Doe asked John Doe "Is there anyone you're avoiding here?" John Doe didn't think much of that question at the time and responded "Yeah, the girl I probably would've asked had I not asked you." He was referring to a fellow student, D.K. Jane Doe and John Doe then found seats in the press box and talked about a range of topics, including family and friends. John Doe mentioned that his birthday was the following Wednesday and Jane Doe asked to take multiple photos with John Doe before they left the party. In total, the two spent four hours at the racetrack.  John Doe and Jane Doe each consumed approximately two alcoholic drinks during those four hours, and John Doe also had one sip of a friend's flask that contained alcohol. Toward the end of the day, at approximately 5:30pm, John Doe and Jane Doe decided to take an Uber back from the racetrack. John Doe asked Jane Doe if she would like him

to add a stop for her so that she could return home. Jane Doe declined, indicating that she preferred to return to John Doe's house together.

25.     Once they were at John Doe's house, they attempted to have sexual intercourse, but did not because John Doe was unable to get an erection. After trying to have sex, Jane Doe said it was alright because she was too drunk anyway. John Doe responded that it wasn't because he was drunk and that he actually was pretty sober. He found it odd that Jane Doe said she was drunk since he had been with her all day and they only had approximately two drinks each over the course of five hours. However, he chalked it up to her trying to be kind about his inability to perform sexually.  At that point, they decided simply to take a nap and slept for almost two hours. When John Doe awoke, Jane Doe was already awake. They began kissing and engaged in consensual sexual intercourse, during which Jane Doe was an active and enthusiastic participant. Afterward, the two got dressed and John Doe walked Jane Doe back to her house at approximately 9:00pm. On the walk home, she talked about a silent disco party that her house hosted the night before, and they engaged in other friendly conversation. When they got to Jane Doe's house, she gave John Doe a tour of the house and alluded to his returning again in the near future. Jane Doe gave John Doe a kiss goodbye, and John Doe walked back to his house.

### The February 2, 2022 Encounter

26.     In the early afternoon of February 2, 2022, Jane Doe texted John Doe to wish him a happy birthday and  the two exchanged friendly text messages for much of the afternoon. That evening, John Doe went to two bars, with friends, to celebrate his birthday. At approximately 9:00pm, John Doe and his friends left the second bar and went to a friend's house to prepare for a

scheduled fraternity event. John Doe and Jane Doe continued to exchange text messages, including a text from Jane Doe saying "we can celebrate later."

27.     Near the end of the fraternity event, at approximately 12:00am, John Doe texted Jane Doe to see if she wanted to hang out.  She responded "yes." John Doe took a Lyft to Jane Doe's house intending to pick up Jane Doe and walk back to his house.

28.     When John Doe arrived at Jane Doe's house, she came outside and they walked together to his house. During their walk, they discussed the social events they each attended. At John Doe's house, they went to his bedroom and engaged in consensual sexual intercourse. John Doe wore a condom during the encounter and both went to sleep almost immediately after.

29.     John Doe and Jane Doe awoke the next morning to the sound of Jane Doe's alarm, which she had set on her phone. After engaging in several minutes of mutual kissing, Jane Doe said she had to go to work. John Doe offered to walk her home, an offer she initially rejected, but John Doe said it was the right thing to do.  Jane Doe smiled at this sentiment. As they dressed, John Doe made a joking comment to the effect of "I'm happy I did better this time" in reference to his inability to engage in sexual intercourse during their previous encounter. Again, Jane Doe smiled in response.

30.     As they walked to Jane Doe's house, they talked in an easy and friendly manner. Jane Doe spoke about attending Montessori as a child when they passed a local Montessori school. At Jane Doe's house, they kissed goodbye and Jane Doe again wished John Doe a happy birthday. John Doe returned home.

31.     The following night, February 3rd, John Doe went to a bar with a few friends, where he ran into a woman, "A.H", on whom he had a crush. He offered to buy her a drink and they

started talking in the middle of the bar, a conversation lasting more than an hour.  John Doe and

A.H then left the bar together, returned to John Doe's house, and engaged in consensual sexual

activity. Upon information and belief, Jane Doe saw John Doe talking to A.H. at the bar and heard

that he and A.H. went home together.

***Jane Doe Spreads Defamatory Information about John Doe to Friends and Classmates***

32.    Upon information and belief, on February 4th, a day after seeing John Doe with

A.H., Jane Doe reported to one of John Doe's friends, T.R., that John Doe engaged in

nonconsensual sexual activity. Upon information and belief, this was Jane Doe's first instance of

alleging such misconduct.

33.    Upon information and belief, by February 6th, false rumors had begun spreading

around school alleging that John Doe had sexually assaulted a female student. On February 7th,

John Doe's friend "T.G." informed John Doe that people were talking about him in a negative way

and that a fellow student, "A.S.," one of Sue Roe's best friends, had posted on her Instagram story

a message to the effect of "Being friends with a sexual assaulter means you are part of the problem"

with an indication that she was referring to John Doe.  John Doe did not know what he was accused

of doing and received no concrete information of the specific claims circulating about him.

34.    Another of John Doe's friends, M.K., showed him an Instagram post from Jane Doe

that stated "Being drunk is not an excuse for Sexual Assault," which was posted at the same time

and seemingly in conjunction with A.S.'s post. That night, fellow classmate, S.B., drove John Doe

home from class. During the drive, she warned John Doe that Jane Doe was "crazy."

35.    John Doe then heard from another fellow student, A.T., that she was told by three

different people that John Doe had assaulted a Tulane student. One of the students who shared this

information with A.T. was abroad in Spain and had heard it from friends in a different Tulane

fraternity.

36.    John Doe was shocked that this false information had made its way to students

studying abroad, even prior to John Doe himself hearing about it. John Doe was unaware of the

specifics of the false allegations and did not even know to whom the allegations pertained.

37.    On the evening of February 8th, John Doe received a text message from Jane Doe,

falsely claiming John Doe engaged in sexually inappropriate behavior:

> After we had consensual sex on your birthday, I told you that I was tired and wanted
> to sleep. At first you said that was fine but then 10 minutes later you asked me to
> have sex again to which I responded no, that I was tired and didn't want to. You
> continued to ask me to have sex with you multiple times, each time with me saying
> no and asking you to go to sleep. I woke up to the sound of you jerking off and the
> feeling of you taking the blanket off my naked sleeping body and touching and
> squeezing it as you pleased. Even though I was paralyzed with fear and half asleep,
> I mumbled that I was cold and tried to pull the blanket back onto me. You then
> pulled the blanket off of me again and continued to pleasure yourself and touch me.
> You took advantage of my body in my most vulnerable state, and had no regard for
> how violating your actions were to me. You are a predator and a repeat offender,
> and will not manipulate or invalidate my assault, like you did to your previous
> victim. It blows my mind that you were able to manipulate people around you into
> staying friends with you but this time you will be held fully accountable or the
> trauma that you actions caused. You will be known for the disgusting coward you
> truly are. You need serious help, and honestly I don't care if you ever get it, but I
> do know that you will never have the opportunity to violate someone ever again.

38.    The text message shocked and scared John Doe. He recalled their two sexual

encounters, which had occurred in the previous several days and knew he had not committed any

of the acts that Jane Doe was claiming.

39.    The following day, John Doe met with multiple friends to discuss the rapidly

spreading false claims about him. Two of his friends called John Doe's parents to tell them it was

not safe for him to be on the Tulane campus and that someone should come get him and bring him

home to his parents' house. That evening, the president of John Doe's fraternity informed John Doe that Jane Doe had called him, claiming that John Doe assaulted her and that she was "going to the school."

40.     That day, John Doe learned from two of his male friends that Jane Doe had approached a group of John Doe's female friends to share her false allegations of assault. Jane Doe specifically asked one of his friends, T.R., to help "spread this news like wildfire."

41.     A point of confusion for John Doe was that Jane Doe's text referenced a prior sexual experience with another woman. John Doe assumed, without knowing, that the woman to whom Jane Doe referred was Sue Roe. After last having consensual sex with Sue Roe, John Doe assumed he was asked to leave because of the comments he made that upset Sue Roe. When John Doe later reached out to Sue Roe by text message, Sue Roe responded and claimed she had D.E. ask John Doe to leave because he woke her up to try to get her to have sex again. John Doe knew that Sue Roe's text to him described events that simply never occurred, but he felt this may have been Sue Roe's way of excusing her active participation in the sexual encounter and pacifying her own feelings of guilt and regret. John Doe did not resist her characterization so as to preserve Sue Roe's feelings.

42.     In hindsight, Jane Doe's statement that John Doe was a repeat offender, coupled with Jane Doe's odd comment at the race track about whether there was anyone there that John Doe was avoiding, made John Doe suspect the two had been communicating all along.

43.     As early as February 7th, several of John Doe's friends stopped responding to his texts and calls. On February 8th, hours after receiving Jane Doe's text message, John Doe learned that a friend had seen the text message Jane Doe sent John Doe. In fact, John Doe's friend had

been provided with a screenshot of the text from yet another friend. It became clear that this false narrative was spreading rapidly among fellow Tulane Students. Upon information and belief, the screenshot of Jane Doe's text message to John Doe included the contact name she had inputted for John Doe's number. The contact name was "rapist," and therefore anyone who received the screenshot saw John Doe referred to as a rapist by Jane Doe.

44.    On February 10, 2022, John Doe was kicked out of his fraternity group chat. The fraternity president then sent a message referencing the claims against John Doe to the group chat, which John Doe learned from a friend who had taken a screenshot of the message. John Doe called the fraternity president, asking him to change or delete the defamatory message, which he refused to do.

45.    John Doe's mother flew to Louisiana that same day, February 10th, to support her son and help him gather his items so he could return home to a safe environment. Due to the mental anguish and heightened anxiety John Doe was experiencing as a result of the false accusations, John Doe withdrew from the University for the semester, as he had already completed enough credits the prior semester to graduate. When John Doe withdrew on February 11, 2022, he was unaware that a Title IX report had been filed or that an investigation had commenced.

*Jane Doe Reports False Claims Against John Doe with Tulane's Title IX Office*

46.    Jane Doe reported her false claims to the University Case Management and Victim Support Services (CMVSS) on February 6, 2022, three days after John Doe had had sex with someone else. Jane Doe falsely claimed to a Student Affairs Professional at the University that she had woken up to a man "beating off on [her]."

14

47.     On February 11, 2022, Jane Doe and Sue Roe simultaneously submitted Title IX / Sexual Misconduct reports naming John Doe as the respondent. Both reported having consensual sex with John Doe, falling asleep, and waking up to him engaging in sexual activity. Sue Roe claimed that John Doe vaginally penetrated her with his fingers and masturbated as she got dressed. Jane Doe claimed that John Doe masturbated while touching her buttocks with his hands and penis. Both claims were unequivocally false.

48.     On February 16, 2022, John Doe received a letter from Christopher Zacharda, Tulane's Director of Student Conduct, informing him that the Office of Student Conduct had received information that he may have violated the Tulane University Code of Conduct and had therefore been charged with Sexual Assault (the "OSC Notice"). The OSC Notice also included a link to Tulane's "Investigation Procedural Protections" (the Investigation Protections"). The OSC Notice informed the recipient "Please also be reminded that the Student Code of Conduct prohibits making false statements and/or knowingly providing false information in the course of a Tulane grievance process, including an investigation and hearing pursuant to the Student Code of Conduct." The Investigation Protections further provided "The investigation is designed to provide a fair and reliable gathering of the facts by a trained and impartial investigator, who will determine consequences, if any." (Emphasis added.)

49.     Upon information and belief, Jane Doe received a similar letter from Zacharda with the same link to the Investigation Protections. Upon information and belief, Jane Doe was aware of the University's Investigation Protections and that these protections were afforded to John Doe.

50.     Upon information and belief, Jane Doe and Sue Roe scheduled their investigation Interviews to be within one hour of each other. On February 16, 2022, Jane Doe was interviewed

by University investigator Jacqueline Barber. During her interview, Jane Doe made numerous false defamatory statements about John Doe, including claims that John Doe persisted in convincing Jane Doe to have sex with him again after their admittedly consensual sexual intercourse. Jane Doe's false claims included:

    a.   "I must have drifted asleep because I woke up to him. I could feel him jerking off."

    b.   "And I can feel him jerking off. And I was half asleep. So, I was like, what the hell is going on. But it wasn't until I felt him pull[sic] a blanket off of me, off of my body, I was naked and I was asleep because we had sex and I was just naked, I don't know. I felt him put a blanket off of me. And I felt him scoot closer to me to jerk off onto me, onto my body."

    c.   "I then have felt him start to touch me and squeezing me mostly my legs and my butt."

    d.   "And then, I felt him pull the blanket back again off of me and continue to do it."

    e.   "And even though I had explicitly not given consent, he had no regard for that. And because I was asleep, just like did that."

    f.   "…as I was leaving, he pulled me in and kissed me."

    g.   "He kept waking me up. He would physically move my shoulder to try and wake me up and be like, 'Wait, do you want to have sex?' And try

    h.   "And then, he shifted towards me to make his penis touch me. And then, he started to grab my body to help him I guess…. My thighs and my butt."

    i.   "….consent was explicitly not given and it was just taken. And it was unwanted action, specifically a sexual action that I explicitly did not give consent for."

51.     Jane Doe's false statements to Barber closely mirrored false statements given to Barber by Sue Roe. In Sue Roe's narrative, she similarly made false claims that, after consensual sex, John Doe had woken Sue Roe up and made multiple requests for sexual activity. Sue Roe's narrative also included false claims that John Doe masturbated in her presence without consent. Jane Doe modeled her testimony after Sue Roe's narrative, which, upon information and belief, Sue Roe communicated to Jane Doe. In fact, in her interview with Barber, Jane Doe states that John Doe's friends "were aware about the previous situation with [Sue Roe]. But [Sue Roe], obviously, will[sic] tell you her story."

52.     In her interview with Barber, Jane Doe also acknowledged that she was aware of the damage her false claims had done to John Doe's life thus far, stating that she spoke with the president of John Doe's fraternity who "let [John Doe] know that he was banned from all events and the house, and no longer affiliated with [the fraternity]."

53.     Jane Doe made further false defamatory statements to Barber about John Doe, stating "And that's part of the thing that pisses me off the most is that he was able to manipulate and gaslight all of their mutual friends into thinking that it was like a normal, just weird thing, was something he was working on, not a sexual assault, which is like what it is." Jane Doe also read to Barber the text she had sent to John Doe on February 8th, communicating false and defamatory information about John Doe. She also complained hearing from friends that that John Doe allegedly "slept with so many girls," expressing negative opinions on John Doe's sexual history. She concluded her interview with Barber expressing her desire to destroy John Doe's academic career and reputation, stating "I want him to be expelled" and "I also want [Jane Doe's sexual misconduct claims] to be attached to his name."

54.     On February 18, 2022, two days after Jane Doe's interview with Barber, John Doe received a letter from Zacharda informing him that "as a result of the information [the Office of Student Conduct] had received" interim measures were being applied and John Doe was banned from being on campus, effective immediately. John Doe was barred from participating in University-sponsored or recognized events or activities. The term of the ban was indefinite. In texts submitted to Barber during the investigation, Jane Doe seemingly brags that "[John Doe] will most likely be banned from campus if my report identifies him as an imminent threat."

***Jane Doe Reported a False Timeline to Conceal Her Conspiracy with Sue Roe***

55.     During her interview with Jane Doe, Barber inquired how Jane Doe and Sue Roe had connected. Jane Doe stated that she had spoken to someone about her claims against John Doe on February 5th. The individual who Jane Doe was speaking to responded by referencing Sue Roe's allegations. Jane Doe expressed shock upon hearing this when stating, "…[the other girl] was like, 'Oh, I did hear something weird with him like jerking off with another girl' and I was like 'What? What do you mean?'"

56.     Jane Doe's claim of ignorance to Sue Roe's allegations on February 5th contradicts what Jane Doe's friend, N.B. reported to Barber. According to N.B., on or about January 28th N.B "warned" Jane Doe about John Doe prior to the event at the racetrack via Facetime and referenced Sue Roe's negative opinion of John Doe "I've heard bad things about this guy."

57.     N.B. later verified that Jane Doe expressed a desire to find out the specifics of what happened between John Doe and Sue Roe. This desire to learn more about John Doe and Sue Roe's experiences further explained Jane Doe's odd question at the racetrack event, during which she

asked John Doe "Is there anyone that you're avoiding here?" in the hopes that she would gain information from John Doe about Sue Roe's opinion of him.

58.    Jane Doe claimed in her interview with Barber that she was connected to Sue Roe through those mutual friends on or about February 8, 2022. In fact, N.B. submitted to Barber purported "evidence" showing a text where N.B. requested to connect with Sue Roe on Jane Doe's behalf. Sue Roe submitted similar purported "evidence" of her text message conversation with N.B. regarding Jane Doe. Upon information and belief, both Jane Doe and Sue Roe staged the introductory text messages in anticipation of filing false claims against John Doe.

59.    John Doe communicated to Barber that it was suspicious that N.B. selectively included dates and times on some, but not all, of the texts submitted for investigation. John Doe further detailed the suspiciousness of Jane Doe and Sue Roe never providing direct correspondence between the two, but rather communications through a third party. Jane Doe was given the opportunity to confirm the timestamps of the texts and submit verification of her first correspondence with Sue Roe. Rather than confirming their alleged timeline, Jane Doe responded by calling John Doe's suspicions "Self-validated analysis [that] fails to consider any other point of view than John Doe's - a white male college student."

60.    In fact, Jane Doe and Sue Roe connected on Instagram long before John Doe's February 2nd sexual encounter with Jane Doe. Instagram allows for both "public" accounts and "private" accounts. Any Instagram account can view information/data posted on a public account, including pictures posted, stories posted, who follows the public account, and who the public account follows. The only mechanism that a public account has to prevent a user from viewing their information is to "block" them, meaning that the Instagram account will no longer appear for

the user. In contrast, private accounts allow the account holder to limit who has access to their

data. Therefore, an Instagram user must "request" to follow a private account and the private

account must "accept" the follow request. Once this process is completed the "requester" can see

the information on the account that they requested to see. Private accounts can also remove people

from their followers list, restricting someone who previously had access to the account from

viewing anything once they are "removed."

61.     Instagram also allows for Direct Messages (DM), which are messages sent from

one account to another account through Instagram messaging software. A private account must

allow another person access to their data in order for that other person to send a direct

message. Furthermore, it is customary and common practice to "follow back" another account,

particularly when the Instagram user know the holder (person) of the account that followed that

user and when that user followed the account holder first.

62.     At all times relevant herein, Jane Doe's Instagram account was a public Instagram

account, and thus any account, unless blocked by Jane Doe, could view a list of her followers, a

list of people she follows, all her posts, and her Instagram stories. The list of an Instagram user's

followers is chronological. At the top of the list are the most recent followers, and at the bottom

of the list are the user's first followers. Therefore, Jane Doe's followers list served as a timeline of

who followed Jane Doe on Instagram, providing a chronological order of the people Jane Doe

interacted with (hereinafter "Chronological List").

63.     First on the Chronological List was T.R., who John Doe witnessed Jane Doe

meeting on January 29, 2022 at the pregame prior to the event at the racetrack. Jane Doe asked

T.R. to take a picture together on the party bus from Tulane's campus to the racetrack. Jane Doe

told T.R. that she would "DM" the picture to her. In order to do this, T.R. would have had to accept Jane Doe's follow request. Upon information and belief, after T.R. accepted Jane Doe's follow request, Jane Doe followed T.R. back.

64.    There were nine accounts in between T.R.'s account and fellow classmate L.A.'s account on the Chronological List. Upon information and belief, none of those accounts are owned by people Jane Doe interacted with over the weekend January 29, 2022.

65.    The next relevant account followed on the Chronological List was L.A. who was at the "Silent Disco" party with Jane Doe on January 28, 2022.  L.A. posted evidence of her attendance on Instagram and Jane Doe posted evidence of her own attendance on Tik Tok. Both posts showed the same neon banner in the living room of the house hosting the party. Next on the Chronological List was Sue Roe, and thereafter the next Tulane students on the Chronological List were several of John Doe's friends to whom John Doe had introduced Jane Doe at the racetrack on January 29, 2022.

66.    Although Jane Doe and Sue Roe claimed to Barber that they first connected on February 8, 2022, after the alleged incident on February 2, 2022, even providing "confirmation" through their texts with N.B., Jane Doe's own Chronological List shows that Jane Doe and Sue Roe connected on Instagram at least a week prior to that date.

67.    Upon information and belief, Jane Doe and Sue Roe began communicating on or about January 28, 2022, rather than the false date they provided to Barber., Jane Doe and Sue Roe not only made false statements to Barber in support of their narrative, but also provided falsified evidence specifically created to support that narrative.

***Jane Doe Provides False Information and Submits Doctored Evidence to Tulane Investigator***

68.    Jane Doe testified to Barber that she did not know with whom John Doe had had sex after his encounter with Jane Doe. However, text messages submitted to Barber by witnesses indicated otherwise. In texts from February 9, 2022, submitted by Jane Doe's friend K.R., Jane Doe asked "Have you heard anything from the girl that [John Doe] got with on Thursday?" and proceeded to inform K.R. of the woman's name.

69.    Jane Doe also pressured witnesses to align their testimonies with Jane Doe's. Jane Doe shared confidential documents containing information about the investigation with witnesses prior to their interviews. Jane Doe even showed one witness her complaint, saying "This is my statement to the school. So I want you to know, this is how I wrote it, this is how I want it to be told…if there's close friends or people, just make them aware this is what happened."

70.    Jane Doe also deleted all the text messages between her and John Doe from her phone after she reported John Doe to Tulane's Sexual Aggression Peer Hotline and Education (SAPHE) on February 6, 2022, and in advance of her interview with Barber.

71.    Some of the texts Jane Doe deleted, which John Doe later provided to Barber, confirmed that Jane Doe had materially lied during her interview with Barber. In her interview, Jane Doe claimed, multiple times, that the first time she ever had sex with John Doe was on February 2, 2022. This was false, as Jane Doe and John Doe had had sex on January 29, 2022. This was proven false by text messages between Jane Doe and John Doe on January 30, 2022 and confirmed by N.B.'s testimony who said, "This was not the first time they had had sex" when referencing the February 2nd consensual encounter. Jane Doe lied about the January 29th consensual sexual encounter to create the narrative that it was "fucked up" when John Doe walked her home on February 3, 2022, as though they had not had relations prior to the alleged encounter

on February 2, 2022. There was nothing abnormal about John Doe walking her home again the morning after their February 2, 2022 encounter, as it was a normal and usual course of action in the context of their sexual relationship.

72.    Upon information and belief, Jane Doe deleted these text messages because they would disprove aspects of her false narrative.  She claimed to Barber, however, that she had deleted the text messages because she did not want to look at them.

73.    While at the racetrack with John Doe on January 29, 2022, Jane Doe asked John Doe to take a picture of her by the track. He agreed and she later posted it on her Instagram account. Jane Doe eventually removed the photograph from Instagram, but only after she had been interviewed by Barber and asked to provide evidence and witnesses. Upon information and belief, Jane Doe removed the photograph once it became clear that it could be collected as relevant evidence in the investigation, attempting to retroactively align her social media accounts with her fabricated assault.

74.    In a broader pattern of fabrication, John Doe soon learned that much of the personal information Jane Doe had shared with him was false. For instance, she had told him she had transferred from North Carolina State University, but John Doe then noticed that an entirely different school was listed on Jane Doe's LinkedIn page.

75.    Jane Doe also told Barber that on the morning after the alleged assault, she was "trying to slip out without waking him or anything, but I remember he woke up." Jane Doe had actually texted John Doe the night before – the night of their sexual encounter – informing him that she would need to leave early, stating "I just have to leave at like 8:15" and then proceeded to

set an alarm around 8:00am that woke both of them up. However, as Jane Doe had deleted all of her text messages, it was John Doe's record of text messages that indicated the inconsistency.

76.    Jane Doe utilized social media to defame John Doe. On March 12, 2022, Jane Doe posted a Tik Tok video of herself singing along with a song, with the words "Knowing consent can't be given while someone's sleeping" appearing onscreen. As Jane Doe had already spread her false claims about John Doe to countless friends of both parties, friends of Jane Doe and John Doe understood the implication of the Tik Tok video to mean John Doe engaged in non-consensual sexual activity with Jane Doe while she was asleep. This video was posted immediately after John Doe began contacting witnesses to gather information regarding the false allegations Jane Doe was making and, upon information and belief, was a tactic to get John Doe to stop.

**Jane Doe's Allegations Are Contradictory**

77.    John Doe was sleeping during the time in which Jane Doe alleges non-consensual sexual activity took place and thus did not do what Jane Doe alleges.

78.    On three separate instances, Jane Doe expressed her belief that John Doe was aware of committing the alleged acts of sexual misconduct:

> i.    A mutual friend of Jane Doe and John Doe, B.M., sent Jane Doe a text message on February 9, 2022 informing her that John Doe denied knowing anything about the events Jane Doe had described in her text to John Doe. Jane Doe's response to that denial was "Wow, I can't believe he denied the situation."
>
> ii.    When asked during the investigation by Barber "What gives you that impression[,] that certainty that he knows? That you didn't want him to do

that?" Jane Doe answered "Because I explicitly said no many times." Based on her statement to Barber and her text message to B.M, Jane Doe claimed that John Doe knew that he had committed the alleged conduct.

    iii.   Jane Doe elaborated to Barber at a different point in the interview "what made me think that he knew that I knew something was wrong is that he seemed to not want me out of his sight" on the morning of February 3rd. Jane Doe was presumably referring to John Doe's offer to walk her home.

79.    Yet, on two instances revealed in the investigation, Jane Doe acknowledged John Doe would have no way of knowing the events in the allegation transpired:

    i.   In text messages from February 8, 2022, submitted to Barber by witness K.R., Jane Doe asked K.R. "Do you know if [John Doe] knows?" in reference to the allegations she was making.

    ii.   Jane Doe's text message of allegations to John Doe on February 7, 2022 operates under the presupposition that John Doe did not know what he did. In that text message, Jane Doe gave John Doe a false play-by-play of their night together, feeding him her false narrative for the first time.

***Jane Doe Attempts to Cover Up Motives for Defaming and Harassing John Doe***

80.    Upon information and belief, Jane Doe was motivated by jealousy to make false statements about John Doe to Tulane investigator Barber, fellow Tulane students, Louisiana civil court, and numerous people who were friends with John Doe.

81.    Jane Doe transferred from another school during the Covid-19 pandemic and did not have many friends when she met John Doe. Jane Doe sent text messages to John Doe indicating

she was grateful that he introduced her to his friends: "I appreciate you introducing me to your friends it's hard to find nice girl friends here that aren't crazy bitches." Jane Doe followed many of John Doe's friends on Instagram after the racetrack event he took her to. She clearly did not want to lose the friends she had made through John Doe, but knew that if she and John Doe did not continue to see each other, his friends would likely stop socializing with her.

82.    Text messages submitted to Barber by fellow student, T.R., showed Jane Doe expressing to T.R. that she had feelings for John Doe. However, on February 3, 2022, a day after her second and final sexual encounter with John Doe, Jane Doe saw John Doe out with another woman, and learned that he had gone home with the woman.

83.    Jane Doe did not make any allegations of non-consensual sexual conduct the day after her sexual encounter with John Doe. In fact, both friends with whom she spoke the next day testified that Jane Doe characterized the sexual encounter as consensual and normal.

84.    In her interview with Barber, Jane Doe's friend N.B. said "And from what she told me the next morning they had consensual sex and she was comfortable with the situation."

85.    Jane Doe's close friend and roommate, E.M., told Barber that she had asked Jane Doe about the sexual encounter the very next day. Jane Doe responded that it was "fine." It was two days later – after Jane Doe learned that John Doe had had sex with another woman – that Jane Doe told E.M. "this really weird thing happened" and proceeded to spin the false narrative claiming John Doe had repeatedly asked if she wanted to have sex and then masturbated next to her. In her interview, E.M. testified to Barber that Jane Doe changed her story only after seeing John Doe out with another woman.

86.     After learning that John Doe had sex with another woman shortly after his sexual encounter with Jane Doe, and realizing that John Doe did not have reciprocal feelings for her, Jane Doe became outraged. She set out to destroy John Doe's reputation, education, and career. In her interview with Barber, Jane Doe stated "He would have this nice little comfy job that he had all lined up by mommy and daddy" and "I want him to be expelled. And now, that he's been an idiot and withdrawn, then he literally can't reenroll or transfer, or graduate." In text messages to friend K.R. on February 9, 2022, Jane Doe specifically inquired as to John Doe's postgraduate work plans, asking whether K.R. knew whether John Doe intended to work for a particular company after graduating.

***Jane Doe Files for a Temporary Restraining Order, Provides Court with False Information***

87.     On March 16, 2022, Jane Doe filed a Petition for Protection From Abuse, also known as a Temporary Restraining Order (TRO), in Louisiana civil court. In her petition, Jane Doe requested that John Doe be barred from contacting her through third parties and from stepping foot on Tulane's campus. The TRO falsely alleged that John Doe had been harassing, intimidating, and stalking Jane Doe, despite the fact that John Doe had had no contact with Jane Doe since he first heard of her false claims through mutual friends. In fact, John Doe did not even respond to Jane Doe's February 8, 2022 text message, the last correspondence between the parties.

88.     In her TRO, Jane Doe cited instances of John Doe calling their "mutual friends and interrogating her." However, the one mutual friend John Doe had contacted, T.R., informed Barber that John Doe had called her, but made no mention of harassment or interrogation. In fact, T.R. voluntarily submitted evidence of her agreeing to speak on the phone with John Doe. Jane Doe also claimed John Doe harassed and stalked her by calling two other mutual friends to gather

27

evidence for this investigation. Jane Doe knew that John Doe's phone calls to his own friends, to discuss the ongoing Tulane investigation, did not constitute or include any harassing behavior, but Jane Doe nonetheless utilized and abused the civil court process as a way to bolster her claims and restrict John Doe from contacting relevant witnesses in the Tulane investigation. Furthermore, Jane Doe recognized that if she had a restraining order against John Doe, Tulane would view the TRO as evidence of John Doe's alleged wrongdoing and Jane Doe's alleged fear and trauma.

89.    In order to get the TRO dismissed, John Doe flew to New Orleans from South Carolina on March 24, 2022. However, Jane Doe did not even attend the court hearing. Thus, the TRO was summarily dismissed in her absence. After the hearing John Doe and his mother saw Jane Doe at the airport. It was clear that Jane Doe's false allegations of harassment and stalking were not made in earnest but rather with malicious intent in order to serve her own self interest in the Tulane investigation.

90.    On May 8, 2022, John Doe was found responsible of the charge of sexual assault and was dismissed from the University, less than one month before he was due to graduate.

91.    Jane Doe filed a false report of sexual misconduct, colluded and conspiring with Sue Roe, and maliciously defamed, harassed and retaliated against John Doe by pursuing a false complaint with Tulane's Office of Student Conduct. Jane Doe strategically exploited and manipulated Tulane's Title IX process to pursue a false report against John Doe and to harm John Doe's reputation, destroy John Doe's relationship with his friends and fraternity, and harm his academic career and future career plans. In doing so, Jane Doe deprived John Doe of the benefit he was to receive from his contract with Tulane under the Code, which had promised John Doe an

educational environment free from false information furnished to the University or to a University official, as well as an educational experience free from harassment or intimidation.

## AS AND FOR A FIRST CAUSE OF ACTION
### Defamation

92.    Plaintiff repeats and realleges each and every allegation hereinabove as though fully set forth herein.

93.    Defendant made false and defamatory statements about John Doe to administrators at Tulane University, to the president of John Doe's fraternity, to John Doe's friends, to the Louisiana civil court, as well as to numerous fellow students.

94.    Defendant's statements were made with actual malice and reckless disregard for the truth.

95.    Defendant's statements during the Title IX proceedings were defamatory and are not protected by "privilege" because Defendant made those statements knowing they were false.

96.    Defendant made non-privileged defamatory false statements that were culpably published and that were damaging.

97.    Defendant's statements were intended to, and did, expose Plaintiff to public contempt, aversion, disgrace, induce an evil opinion in the minds of right-thinking persons.

98.    The specific statements accusing Plaintiff of engaging in non-consensual sexual conduct are factual: the language used and the context in which the language appeared made clear that Defendant was factually accusing Plaintiff of engaging in sexual assault and sexual harassment.

29

99.    Defendant falsely accused Plaintiff of sexual misconduct, defaming his name and reputation by knowingly pursuing a false complaint of misconduct with Tulane's Office of Student Conduct.

100.    Defendant knowingly pursued a false report of sexual misconduct against John Doe, fabricating and publishing a series of events that never occurred and contained a multitude of vile acts, including non-consensual touching, nonconsensual masturbation, stalking, and harassment.

101.    Defendant published this false allegation to numerous people when she pursued a false claim of sexual misconduct with the University, as well as in communications – written and verbal – to friends, acquaintances, and classmates.

102.    Publication of this false and defamatory statement is also actionable because it has resulted in special harm, in the form of economic losses, including but not limited to Plaintiff's tuition, academic career, impending college degree, future career aspirations, and the lifelong business and social relationships that would have been developed through his association with fellow Tulane students and membership in the fraternity.

103.    Publication of this false and defamatory statement is actionable per se as it concerned a crime of moral turpitude; namely, sexual assault.

104.    The aforesaid statement was defamatory because it imputed conduct which injuriously affected John Doe's reputation and/or degraded him in society and/or brought him into public contempt while causing emotional and psychological damages.

105.    There was never a criminal investigation of Defendant's claims because there was no factual information to support her claims.

106.    Defendant cannot rely on the Tulane University Office of Student Conduct decision as a defense to Plaintiff's defamation claim because the testimony upon which the decision is based was based on the same false and defamatory statements that John Doe engaged in acts of sexual misconduct, as well as false testimony, falsified evidence, and fraudulent conduct.

107.    Based on the foregoing, Defendant is liable to Plaintiff for defamation.

108.    As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, emotional distress, damage to reputation, loss of educational and career opportunities, loss of future earning capacity, economic injuries, emotional and psychological damages, and other direct and consequential damages.

109.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A SECOND CAUSE OF ACTION
### <u>Abuse of Process</u>

110.    Plaintiff repeats and realleges each and every allegation hereinabove as though fully set forth herein.

111.    Defendant strategically utilized Louisiana's civil court system, filing a Petition for Protection from Abuse against John Doe, for an illegitimate objective; that is, to further harass, defame, retaliate against, and punish John Doe and to strengthen Defendant's Title IX claim against John Doe.

112.    Defendant pursued the Petition for Protection from Abuse with an ulterior purpose, and one for which the Louisiana civil court system was not intended.

113.    Defendant acted knowingly and willfully when she pursued the Petition for Protection from Abuse, knowing the allegations precipitating the petition were false.

114.    The use of Louisiana's civil court process for the purpose of seeking revenge or pursuing a personal vendetta against another individual was improper.

115.    Defendant's primary motive in proceeding with the Louisiana civil court system process was to defame, harass and punish John Doe, despite her knowledge that the allegation of misconduct was false.

116.    Defendant strategically utilized Tulane's Title IX process for an illegitimate objective; that is, to further harass, defame, retaliate against, and punish John Doe.

117.    Defendant pursued the investigation through Tulane's Title IX process with an ulterior purpose, and one for which neither Tulane's OSC process nor Title IX was intended.

118.    Defendant acted knowingly and willfully when she pursued the investigative process, knowing the charge precipitating the process was false.

119.    The use of Tulane's Title IX process for the purpose of seeking revenge or pursuing a personal vendetta against another individual was improper.

120.    Defendant's primary motive in proceeding with Tulane's Title IX process was to defame, harass and punish John Doe, despite her knowledge that the allegation of misconduct was false.

121.    Based on the foregoing, Defendant is liable to Plaintiff for abuse of process.

122.    As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, emotional distress, damage to reputation, loss of educational and

career opportunities, loss of future earning capacity, economic injuries, emotional and psychological damages, and other direct and consequential damages.

123.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION
### Tortious Interference with Contract

124.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

125.    As described above, Plaintiff entered into a valid contract with Tulane University.

126.    Defendant was indisputably aware of the contract between Plaintiff and Tulane University, as she herself was provided with Tulane's Code of Conduct as well as a the OSC Notice with a link to Tulane's "Investigation Procedural Protections."

127.    Defendant was aware that the Student Code of Conduct "prohibits making false statements and/or knowingly providing false information in the course of a Tulane grievance process, including an investigation and hearing pursuant to the Student Code of Conduct."

128.    Defendant was aware that the Code of Conduct prohibits "[f]urnishing false information to the University or to a University official," as well as "Harassment or intimidation."

129.    Defendant was aware that in entering into an agreement with the University, John Doe was conferred contractual rights against Tulane University.

130.    Defendant intentionally, maliciously, and without justification, induced Tulane University not to perform the contract, depriving John Doe of a fair and equitable grievance process.

33

131.    As a direct and proximate result, John Doe was immediately banned from campus upon Defendant's filing of false claims, and John Doe was dismissed from the University at the conclusion of the misconduct investigation, due to Defendant's malicious actions.

132.    Defendant intentionally, maliciously, and without justification, induced Tulane University to cease performance of its contract with Plaintiff and dismiss him from the University.

133.    Defendant's action resulted in actual damage to Plaintiff; namely, the loss of his tuition payment, college degree, as well as future career prospects.

134.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, damage to reputation, loss of educational and career opportunities, loss of future earning capacity, economic injuries, emotional and psychological damages, and other direct and consequential damages.

135.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### AS AND FOR A FOURTH CAUSE OF ACTION
### <u>Intentional Infliction of Emotional Distress</u>

136.    Plaintiff John Doe repeats and realleges each and every allegation hereinabove as though fully set forth herein.

137.    Defendant intentionally inflicted severe emotional distress upon Plaintiff when she knowingly and willfully pursued a false complaint of sexual misconduct against John Doe.

138.    Defendant intentionally inflicted severe emotional distress upon Plaintiff when she participated in the investigation of a complaint of sexual misconduct against Plaintiff conducted

by Tulane's OSC, knowing such a serious charge could result in a sanction of dismissal from the University, in addition to severe emotional damage.

139.    Defendant was substantially certain such distress would result from her conduct, as Defendant utilized Tulane's Title IX process for the very purpose of harassing and retaliating against John Doe.

140.    Defendant was certain such distress would result from this conduct as Plaintiff was ultimately expelled from the University.

141.    Defendant's conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community.

142.    Defendant's actions directly caused severe emotional distress to Plaintiff, including but not limited to post-traumatic stress disorder, as her false reporting of a charge of sexual assault against Plaintiff ultimately led to his dismissal from University, removal from his fraternity, damage to his name and reputation, ostracism from his peers, and severe emotional damage.

143.    The distress suffered by Plaintiff as a result of Defendant's actions was so severe that no reasonable person should be expected to endure it.

144.    Based on the foregoing, Defendant is liable to Plaintiff for intentional infliction of emotional distress.

145.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, damage to reputation, loss of educational and career opportunities, loss of future earning capacity, economic injuries, emotional and psychological damages, and other direct and consequential damages.

146.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Civil Conspiracy

147.    Plaintiff repeats and realleges each and every allegation hereinabove as though fully set forth herein.

148.    Defendant and Sue Roe acted in concert with the common purpose to defame and injure John Doe emotionally, reputationally and economically by engaging in the acts outlined above, including but not limited to the false reporting to Tulane University, John Doe's fraternity, and other individuals that John Doe had sexually assaulted and sexually harassed Jane Doe and Sue Roe.

149.    It was foreseeable that the actions undertaken by Defendant and Sue Roe would result in John Doe being injured and were undertaken by Defendant and Sue Roe for that express purpose.

150.    John Doe has suffered as a direct and proximate result of the above conduct, tremendous damages, including, without limitation, emotional distress, damage to reputation, loss of educational and career opportunities, loss of future earning capacity, economic injuries, emotional and psychological damages, and other direct and consequential damages actions.

151.    John Doe suffered and incurred Special Damages, which were foreseeable and were exacerbated and magnified as a result of the Defendant's conspiracy to defame.

152.    John Doe's injuries were exacerbated and magnified because the defamatory statements were disseminated through electronic communication and published on the Internet.

153.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

**PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff John Doe demands judgment against Defendant Doe as follows:

i.      on the first cause of action, a declaration that Defendant Jane Doe defamed John Doe and an award of compensatory and punitive damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

ii.     on the second cause of action for abuse of process, a judgment awarding John Doe an award of compensatory and punitive damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

iii.    on the third cause of action for tortious interference with contract, a judgment awarding John Doe an award of compensatory and punitive damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

37

iv.    on the fourth cause of action for intentional infliction of emotional distress, a judgment awarding John Doe an award of compensatory and punitive damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

v.    on the fifth cause of action for civil conspiracy, a judgment awarding John Doe damages including but not limited to special damages; and

vi.    awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

### **JURY DEMAND**

John Doe herein demands a trial by jury of all triable issues in the present matter.


Dated: New York, New York
        December 8, 2022


                        **Respectfully submitted,**

                        **NESENOFF & MILTENBERG, LLP**
                        ***Attorneys for Plaintiff***

                        **By:** _/s/ Andrew Miltenberg_
                        Andrew T. Miltenberg, Esq.
                        363 Seventh Avenue, Fifth Floor
                        New York, New York 10001
                        (212) 736-4500
                        amiltenberg@nmllplaw.com
                        *Pro Hac Vice Application forthcoming*

                        -and-

**EKSTRAND AND EKSTRAND, LLP**

**By:** /s/  *Robert Ekstrand*

Robert C. Ekstrand, Esq.
N.C. Bar No. 26673
110 Swift Avenue, 2nd Floor
Durham, North Carolina 27705
Tel. (919) 416-4590
rce@ninthstreetlaw.com
Local Civil Rule 83.1(d) Counsel for Plaintiff